IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

|  |  |  |
|---|---|---|
| **KIM NOLET,** *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Case No.: GJH-20-70 |
| **APS SOLUTIONS, INC.,** *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiffs Kim Nolet, Gervon Flowers,[1] Yvette Hill, and Deborah Fox bring this action against Defendants Arena, Parks, and Stadium Solutions, Inc. ("APS Solutions"), Vincent Caccamo, and Stephanie Boldis Caccamo under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401 *et seq.*, and the Maryland Wage and Payment Collection Act ("MWPCA"), Md. Code Ann., Lab. & Empl. §§ 3-501 *et seq.* Following Defendants' failure to answer or otherwise defend in this action, the Clerk entered default against Defendants on August 17, 2020. ECF No. 8. Now pending before the Court is Plaintiffs' Motion for Default Judgment against Defendant pursuant to Fed. R. Civ. P. 55(b). ECF No. 13. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, Plaintiffs' Motion for Default Judgment is granted, in part, and denied, in part, and default judgment is entered against Defendants in the amount of $313,186.81 for Plaintiff Hill, $23,076.92 for Plaintiff Fox, $23,076.92 for Plaintiff Nolet, and

---

[1] Plaintiff Flowers was Gervon Fox in the initial Complaint. ECF No. 1 ¶ 9. However, Plaintiff Flowers was married in October 2019 and took her husband's name after the marriage. ECF No. 13-3 at 1, 7–8.

1

$20,769.23 for Plaintiff Flowers, plus attorney's fees and costs.

I.     **BACKGROUND**

    A.     **Factual Background**

The following facts are established by the well-pled allegations in the Complaint, ECF No. 1, and evidentiary exhibits in support of the Motion for Default Judgment, ECF No. 13-2; ECF No. 13-3; ECF No. 13-4; ECF No. 13-5; ECF No. 13-6.

        1.     **Defendants**

Defendant APS Solutions is a New York corporation that performs large scale construction projects involving stadiums, amusement parks, sports venues, and other venues in various locations throughout the United States. ECF No. 1 ¶ 13; ECF No. 13-2 ¶ 2; ECF No. 13-3 ¶ 3; ECF No. 13-4 ¶ 4; ECF No. 13-5 ¶ 2. Defendants Vincent Caccamo, APS Solutions' founder and Chief Operating Officer, and Stephanie Boldis Caccamo, APS Solutions' Chief Executive Officer, are co-owners of Defendant APS Solutions and exercise managerial authority and control over the company. ECF No. 1 ¶¶ 13–14; ECF No. 13-2 ¶¶ 3–4; ECF No. 13-3 ¶¶ 4–5; ECF No. 13-4 ¶¶ 2–3; ECF No. 13-5 ¶¶ 3–4. Defendant Vincent Caccamo makes all final payroll decisions, including whether to pay wages and to whom wages should be paid. ECF No. 13-4 ¶ 6.

        2.     **Plaintiffs**

Plaintiffs are Maryland residents who have been employed by Defendants APS Solutions, Vincent Caccamo, and Stephanie Boldis Caccamo since 2018. ECF No. 1 ¶¶ 6–9, 15–18; ECF No. 13-2 ¶ 5; ECF No. 13-3 ¶ 6; ECF No. 13-4 ¶ 5; ECF No. 13-5 ¶ 5. The Court will discuss the facts relating to each plaintiff separately below.

### a.  Plaintiff Yvette Hill

Defendant Vincent Caccamo hired Plaintiff Hill to be APS Solutions' Chief Financial Officer, and Plaintiff Hill began working as CFO for APS Solutions on or about May 7, 2018. ECF No. 1 ¶ 15; ECF No. 13-4 ¶¶ 5–6. Despite her role as CFO, Plaintiff Hill does not have an ownership interest in APS Solutions and was paid regular wages for her work. ECF No. 13-4 ¶ 6. Plaintiff Hill's agreed-upon salary was $250,000 per year, and she was paid weekly. *Id.* ¶ 8.

As CFO, Plaintiff Hill's duties included business development and accounting tasks related to APS Solutions' construction projects. *Id.* ¶ 7. These duties required Plaintiff Hill always to be on call, and she generally worked a full 40-hour or more work week. *Id.* ¶ 10. Plaintiff Hill also frequently worked on weekends in order to communicate with clients and employees working on projects in other states. *Id.* In addition to her regular duties, Plaintiff Hill set up an accounting system for APS Solutions through QuickBooks since APS Solutions had "practically no accounting system" when Plaintiff Hill began her employment. *Id.* ¶ 9.

Despite Plaintiff Hill fully performing her obligations as an employee of APS Solutions, she stopped receiving regular wages on or about January 18, 2019. *Id.* ¶ 11. Since that time, Plaintiff Hill has repeatedly requested her wages from Defendants but has not received those wages. *Id.* ¶ 12. Initially, Defendants stated that they were working on finding money to pay Plaintiff Hill's wages but had to pay other employees first—*e.g.*, construction crews. *Id.* ¶ 13. Plaintiff Hill had received her wages late before and, thinking Defendants would eventually pay her wages, continued working for APS Solutions until June 12, 2019. *Id.* ¶¶ 13–14. On June 12, 2019, Defendants, without formally terminating her, revoked Plaintiff Hill's access to her work email and stopped responding to communications from her. *Id.* ¶ 15.

Between January 18, 2019 and June 12, 2019, Defendants failed to pay Plaintiff Hill

approximately $104,395.60 in wages.[2] *Id.* ¶ 16; ECF No. 13-6 at 1.[3]

Additionally, Plaintiff Hill suffered other harms as a result of Defendants' failure to pay the wages due to her. For example, Plaintiff Hill took out a personal loan of approximately $5,000 to make payments to other APS Solutions' employees after Defendants failed to pay those employees' wages. ECF No. 13-4 ¶ 18. Plaintiff Hill expensed this amount, but never received reimbursement. *Id.* Plaintiff Hill has since defaulted on the loan. *Id.* Plaintiff Hill also defaulted on personal credit card debts and storage unit rent payments as a result of Defendants' failure to pay her wages.[4] *Id.* ¶¶ 19 23. Further, Defendants asked Plaintiff Hill to purchase iPhones and associated plans for APS Solutions, which she did. *Id.* ¶ 20. However, due to her lack of wages, Plaintiff Hill has since defaulted on those purchases as well. *Id.* Finally, before Plaintiff Hill began working for APS Solutions, she rented office space for her own private business. *Id.* ¶ 22. This office space became the Maryland office of APS Solutions after Plaintiff Hill was hired by Defendant Vincent Caccamo. *Id.* Defendant Vincent Caccamo said that he would take over rent payments for the office space, but never did. *Id.* Consequently, Plaintiff Hill continued to pay for the office space until she could no longer keep up with payments because of Defendants' failure to pay her wages. *Id.*

---

[2] This number is calculated by multiplying Plaintiff Hill's gross weekly pay ($250,000/52) by 27.71 (the number of pay periods and fractional pay periods between January 18, 2019, and June 12, 2019). ECF No. 13-4 ¶ 16. Such a calculation is consistent with the Department of Labor's "Handy Reference Guide to the Fair Labor Standards Act[,]" of which the Court can take judicial notice under Fed. R. Evid. 201(b). *Handy Reference Guide to the Fair Labor Standards Act*, U.S. Dep't of Labor, https://www.dol.gov/agencies/whd/compliance-assistance/handy-reference-guide-flsa.

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[4] Because Plaintiff Hill defaulted on her rent payments for the storage unit, the contents of the unit, which included office furniture from her private business, were sold. ECF No. 13-4 ¶ 23.

### b. Plaintiff Deborah Fox

Plaintiff Fox began working for APS Solutions as an executive assistant on or about May 25, 2018. ECF No. 1 ¶ 16; ECF No. 13-5 ¶¶ 5–6. Plaintiff Fox's agreed-upon salary was $50,000 per year, and she was paid weekly. ECF No. 13-5 ¶ 9.

As an executive assistant, Plaintiff Fox's duties included assisting Plaintiff Hill and Defendant Vincent Caccamo in various administrative tasks within APS Solutions, including fielding calls from APS Solutions' employees and traveling to assist with APS Solutions' projects, bids, and other business. *Id.* ¶¶ 6–7, 10. Plaintiff Fox's duties required her to work full-time at APS Solutions' Maryland office and often required her to work during non-business hours as well. *Id.* ¶ 8.

Despite Plaintiff Fox fully performing her obligations as an employee of APS Solutions, she stopped receiving regular wages from APS Solutions on or about January 18, 2019. *Id.* ¶ 11. Since that time, Plaintiff Fox has repeatedly requested her wages from Defendants, but they have not complied with those requests. *Id.* ¶ 12. On March 8, 2019, without formally terminating her, Defendants revoked Plaintiff Fox's access to her work email, and she ceased working for APS Solutions. *Id.* ¶ 13.

Between January 18, 2019, and March 8, 2019, Defendants failed to pay Plaintiff Fox approximately $7,692.31 in regular wages.[5] *Id.* ¶ 14; ECF No. 13-6 at 1.

Additionally, Plaintiff Fox suffered other harms as a result of Defendants' conduct. For example, after she stopped working for APS Solutions, Plaintiff Fox was unable to file for unemployment insurance because Defendants never formally fired her. ECF No. 13-5 ¶ 16. Because Plaintiff Fox received neither her wages nor unemployment, she defaulted on her

---

[5] This number is calculated by multiplying Plaintiff Fox's gross weekly pay ($50,000/52) by 8 (the number of pay periods between January 18, 2019, and March 8, 2019). ECF No. 13-5 ¶ 14.

personal credit cards, defaulted on rent payments for a storage unit,[6] and was unable to afford housing. *Id.* ¶ 17–19.

### c. Plaintiff Kim Nolet

Plaintiff Nolet began working for APS Solutions as the Benefits Director on or about August 20, 2018. ECF No. 1 ¶ 17; ECF No. 13-2 ¶¶ 5–6. Plaintiff Nolet's agreed-upon salary was $50,000 per year, and she was paid weekly. ECF No. 13-2 ¶ 8.

As Benefits Director, Plaintiff Nolet managed insurance for APS Solutions. *Id.* ¶ 6. Specifically, her duties included creating and managing the health, life, and ancillary insurances for APS Solutions' employees; procuring insurance and bonds for APS Solutions' construction projects and submitting related paperwork for each project on a regular basis; and designing company policies related to APS Solutions' employees. *Id.* To fulfill her role as Benefits Director, Plaintiff Nolet worked full-time in APS Solutions' Maryland office and was also on-call during non-business hours, including late at night. *Id.* ¶ 9.

Despite Plaintiff Nolet fully performing her obligations as an employee of APS Solutions, Defendants stopped paying her regular wages on or about January 18, 2019. *Id.* ¶ 10. Since that time, Plaintiff Nolet has repeatedly requested her wages from Defendants, but they have not complied with those requests. *Id.* ¶ 11. Although Plaintiff Nolet had not received her wages, she continued to work for APS Solutions until March 8, 2019. *Id.* ¶ 12–13. Plaintiff Nolet believed that Defendants would eventually pay her if she continued working for APS Solutions based on Defendant Vincent Caccamo's statement that APS Solutions' employees would be compensated for the delay "when the big money comes in." *Id.* ¶ 12. However, on March 8, 2019, without formally terminating her, Defendants revoked Plaintiff Nolet's access to her work

---

[6] Because of the default, the storage facility sold Plaintiff Fox's unit and all its contents, including computers, furniture, and personal mementos. ECF No. 13-5. ¶ 19.

email and she ceased working for APS Solutions. *Id.* ¶ 13.

Between January 18, 2019, and March 8, 2019, Defendants failed to pay Plaintiff Nolet $7,692.31 in regular wages.[7] *Id.* ¶ 14. Defendants also failed to pay Plaintiff Nolet approximately $19,000 for a debt owed to her by Defendants. *Id.* ¶ 15. Specifically, Defendant Vincent Caccamo requested that Plaintiff Nolet take out a $19,000 loan and pay this amount to Plaintiff Hill for office rent. *Id.* ¶ 15. Defendant Vincent Caccamo promised to pay Plaintiff Nolet back by paying her additional wages each week. *Id.* Defendants, however, never repaid the loan. *Id.* ¶ 15.

Additionally, Plaintiff Nolet suffered other harms as a result of Defendants' conduct. Plaintiff Nolet was forced to file for unemployment and food stamps due to Defendants' failure to pay her wages and withdrew $10,000 from her 401(k) in order to make necessary payments and purchases. *Id.* ¶ 18. Moreover, due to Defendants' conduct, Plaintiff Nolet's medical insurance lapsed. *Id.* ¶ 19. Defendants did not make regular medical insurance premium payments as they agreed to do, and Plaintiff was unable to make the payments on her own behalf due to Defendants' failure to pay her wages. *Id.*

### d.     **Plaintiff Gervon Flowers**

Plaintiff Gervon Flowers began working for APS Solutions as an administrative assistant on or about September 28, 2018. ECF No. 1 ¶ 18; ECF No. 13-3 ¶¶ 6–7. Plaintiff Flowers' agreed-upon salary was $45,000 a year, and she was paid weekly. ECF No. 13-3 ¶ 9.

Plaintiff Flowers, as an administrative assistant, assisted Plaintiffs Fox and Hill with day-to-day office operations including filing, mailing, making calls, conducting research, and taking notes during meetings. *Id.* ¶ 7. These duties required her to work full-time at APS Solutions'

---

[7] This number is calculated by multiplying Plaintiff Nolet's gross weekly pay ($50,000/52) by 8 (the number of pay periods between January 18, 2019, and March 8, 2019). ECF No. 13-2 ¶ 14.

Maryland office. *Id.* ¶ 8.

Despite Plaintiff Flowers fully performing her obligations as an employee of APS Solutions, Defendants stopped paying Plaintiff Flowers her regular wages on or about January 18, 2019. *Id.* ¶ 10. Since that time, Plaintiff Flowers has repeatedly requested her wages from Defendants, but Defendants have not complied with those requests. *Id.* ¶ 11. Nevertheless, Plaintiff Flowers continued to work for APS Solutions until March 8, 2019, at which time Defendants revoked Plaintiff Flowers' access to her work email. *Id.* ¶ 12. Defendants never formally terminated Plaintiff Flowers' employment. *Id.*

Between January 18, 2019, and March 8, 2019, Defendants failed to pay Plaintiff Flowers approximately $6,923.08 in regular wages.[8] *Id.* ¶ 13.

Additionally, Plaintiff Flowers suffered other harms as a result of Defendants' conduct. Specifically, when Defendants stopped paying Plaintiff Flowers' wages, she was unable to make her student loan payments and, consequently, the amount due on the loans increased. *Id.* ¶ 15. Eventually, Plaintiff Flowers was able to obtain a deferment, but the process was complicated by APS Solutions' failure to formally terminate her employment. *Id.* Lastly, as a result of Defendants' failure to pay her, Plaintiff Flowers incurred additional credit card debt and had to rely heavily on others for financial support. *Id.* ¶¶ 16–17.

### 3. Additional Facts Surrounding Defendant's Wrongdoing

Plaintiffs' sworn affidavits also allege misconduct by Defendants beyond failing to pay Plaintiffs their regular wages. Plaintiff Fox states that Defendant Vincent Caccamo asked her to lie to APS Solutions' employees who called with complaints regarding pay in order to deflect attention away from his failure to compensate employees. ECF No. 13-5 ¶ 10; *see also* ECF No.

---

[8] This number is calculated by multiplying Plaintiff Flowers' gross weekly pay ($45,000/52) by 8 (the number of pay periods between January 18, 2019, and March 8, 2019). ECF No. 13-3 ¶ 13.

13-4 ¶ 10 (stating Plaintiff Hill was required to field calls from out-of-state employees who were not able to cash their checks from APS Solutions). Plaintiff Fox refused to comply with Defendant Vincent Caccamo's request. *Id.* Plaintiff Nolet states that Defendant Vincent Caccamo would call the APS Solutions' Maryland office "ranting and raving in response to minor perceived business setbacks and would address [Plaintiff Nolet] and the other named Plaintiffs using degrading language[,]" including racial epithets and offensive slurs referring to women. ECF No. 13-2 ¶ 20. Plaintiff Hill and Plaintiff Flowers both state that Defendants Vincent Caccamo and Stephanie Boldis Caccamo spent large amounts of company money on purchases of a personal nature for themselves and their immediate family, such as elaborate trips to Disney theme parks. ECF No. 13-3 ¶ 18; ECF No. 13-4 ¶ 9. Plaintiff Hill further states that Defendant Vincent Caccamo would become angry with her when she marked his personal transactions as owner draws as opposed to business entries in the accounting system and that he made over $500,000 in owner draws during Plaintiff Hill's employment with APS Solutions. ECF No. 13-4 ¶ 9. Plaintiff Flowers adds that Defendant Stephanie Boldis Caccamo also withdrew large amounts of money from the company despite her performing little, if any, work consistent with her position as CEO. ECF No. 13-3 ¶ 18. Finally, Plaintiff Nolet states that Defendant initially refused to issue W2 statements to her and the other named Plaintiffs, and, when such statements were eventually issued, they were untruthful. ECF No. 13-2 ¶ 17. Specifically, Defendants did not make the asserted payments for taxes, social security, or medicare on behalf of APS Solutions despite withholding part of employees' pay for the same. *Id.*; *see also* ECF No. 13-5 (Plaintiff Fox stating that she believes "that the Defendant never paid into the unemployment system").

**B.     Procedural History**

Plaintiffs filed this action against Defendants on January 10, 2020 to recover damages under FLSA, the MWHL, and the MWPCL. ECF No. 1. On January 17, 2020, Plaintiffs served Defendant APS Solutions with process, ECF No. 6, and, on January 18, 2020, Plaintiffs served Defendants Vincent Caccamo and Stephanie Baldis Caccamo. ECF No. 3; ECF No. 4. Defendants failed to file an answer or responsive pleading to Plaintiffs' Complaint. On February 11, 2020, pursuant to Fed. R. Civ. P. 55(a), Plaintiffs filed a motion for entry of default by the Clerk of the Court. ECF No. 7. The Clerk entered an Order of Default on August 17, 2020. ECF No. 8. Plaintiff filed the pending Motion for Default Judgment on November 3, 2020. ECF No. 13.

**II.    STANDARD OF REVIEW**

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). "A defendant's default does not automatically entitle the plaintiff to entry of a default judgment; rather, that decision is left to the discretion of the court." *Educ. Credit Mgmt. Corp v. Optimum Welding*, 285 F.R.D. 371, 373 (D. Md. 2012). Although "[t]he Fourth Circuit has a 'strong policy' that 'cases be decided on their merits,'" *Choice Hotels Int'l, Inc. v. Savannah Shakti Corp.*, No. DKC-11-0438, 2011 WL 5118328 at *2 (D. Md. Oct. 25, 2011) (citing *Dow v. Jones*, 232 F. Supp. 2d 491, 494 (D. Md. 2002)), "default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party[.]" *Id.* (citing *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005)).

"Upon default, the well-pled allegations in a complaint as to liability are taken as true,

10

although the allegations as to damages are not." *Lawbaugh*, 359 F. Supp. 2d at 422; *see also Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (noting that "[t]he defendant, by [its] default, admits the plaintiff's well-pleaded allegations of fact," which provide the basis for judgment (internal citation omitted)). Upon a finding of liability, "[t]he court must make an independent determination regarding damages[.]" *Int'l Painters & Allied Trades Indus. Pension Fund v. Capital Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013). Fed. R. Civ. P. 54(c) limits the type of judgment that may be entered based on a party's default: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." While the Court may hold a hearing to prove damages, it is not required to do so; it may rely instead on "detailed affidavits or documentary evidence to determine the appropriate sum." *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) (citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979)).

### III. DISCUSSION

#### A. Liability

The FLSA requires that employers[9] pay nonexempt employees[10] at least the federal

---

[9] "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d). All named Defendants qualify as employers under this definition.

[10] While FLSA defines "employee" broadly as "any individual employed by an employer[,]" 29 U.S.C. § 203(e)(1), under 29 U.S.C. § 213(a), FLSA's minimum wage requirements do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity[,]" 29 U.S.C. § 213(a). The exemption status of an employee under FLSA, however, "is a matter of affirmative defense on which the employer has the burden of proof[,]" *Clark v. J.M. Benson Co.*, 789 F.2d 282, 286 (4th Cir. 1986), and the "exemptions from FLSA coverage are to be narrowly construed against the employers seeking to assert them," *Purdham v. Fairfax Cty. School Bd.*, 637 F.3d 421, 427 (4th Cir. 2011) (internal quotation marks and citations omitted). Here, Plaintiffs allege they are nonexempt employees and Defendants have provided no response. Thus, Defendants have not met their "burden of establishing the facts requisite to an exemption." *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966)); *see also Smith v. Brennan*, 115 F. Supp. 3d 691, 698 (E.D. Va. 2015) (stating that the FLSA exemption in 29 U.S.C. § 213(a) is "to be narrowly construed"). Moreover, the Court does not find, based on Plaintiffs' duties as described in the Complaint and the affidavits attached to the instant Motion for Default Judgment, that Plaintiffs are clearly employed in "bona fide executive, administrative, or professional" capacities such that they are exempt from FLSA's minimum wage requirements despite their allegations otherwise. *See* 29 C.F.R. §§ 541.100, 541.200, 541.300.

minimum wage for all hours worked. 29 U.S.C. § 206. "The MWHL similarly requires that employers pay the applicable minimum wage[.]" *McFeeley v. Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260, 275–76 (D. Md. 2014) (internal quotation marks and citations omitted). The MWHL is "the State parallel to the FLSA, . . . and the requirements of that provision mirror those of the federal law," meaning Plaintiffs' MWHL claim "stands or falls on the success of" his FLSA claim. *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 242 (D. Md. 2012) (quoting *Friolo v. Frankel*, 819 A.2d 354, 361 (Md. 2003); *Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003)) (internal quotation marks omitted). Separately, the MWPCL requires an employer to pay all wages due for work that an employee performed. Md. Code Ann., Lab. & Empl. § 3-501 *et seq.*; *see also Barufaldi v. Ocean City, Md. Chamber of Commerce, Inc.*, 206 Md. App. 282, 292 (Md. Ct. Spec. App. 2012) ("The [MWPCA] places a duty on employers to 'pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment.'" (quoting *Friolo*, 819 A.2d at 362).

According to the Complaint and Plaintiffs' affidavits attached to the Motion for Default Judgment, Defendants did not pay Plaintiffs any wages, much less minimum wage, for the work Plaintiffs performed between January 18, 2019 and the end of each Plaintiffs' employment—March 8, 2019 for Plaintiffs Nolet, Flowers, and Fox and June 12, 2019 for Plaintiff Hill. ECF No. 1 ¶¶ 19, 22–25; ECF No. 13-2 ¶¶ 10, 13; ECF No. 13-3 ¶¶ 10, 12; ECF No. 13-4 ¶¶ 11, 15; ECF No. 13-5 ¶¶ 11, 13. In response to Plaintiffs' repeated requests for payment, ECF No. 1 ¶ 20; ECF No. 13-2 ¶ 11; ECF No. 13-3 ¶ 11; ECF No. 13-4 ¶ 12; ECF No. 13-5 ¶ 12, Defendants suggested that they were working on paying Plaintiffs their past due wages, but then ended communication with Plaintiffs entirely without paying any of the wages owed to Plaintiffs. ECF No. 1 ¶¶ 21–25; ECF No. 13-2 ¶¶ 12–13; ECF No. 13-4 ¶¶ 13–15. Thus, Defendants are

12

liable under the FLSA, 28 U.S.C. § 206, the MWHL, Md. Code Ann., Lab. & Empl. § 3-413, and the MWPCL, Md. Code Ann., Lab. & Empl. §§ 3-502, 3-505. *See Lawbaugh*, 359 F. Supp. 2d at 422 ("Upon default, the well-pled allegations in a complaint as to liability are taken as true[.]").

### B.     Damages

#### 1.     Liquidated Damages under the FLSA

In the Complaint, Plaintiffs request liquidated damages under the FLSA in addition to unpaid wages. ECF No. 1 ¶ 38. Courts have routinely held that there is a presumption in favor of an award of liquidated damages when the court determines that an employer violated the FLSA and, simultaneously, the MWHL. *Rogers v. Sav. First Mortg., LLC*, 362 F. Supp. 2d 624, 637 (D. Md. 2005); *see also Lanza v. Sugarland Run Homeowners Assoc., Inc.*, 97 F. Supp. 2d 737, 739 n.9 (E.D. Va. 2000). Specifically, unless an employer can demonstrate that it acted in good faith and had reasonable grounds for believing it paid its employee all wages legally owed, an employer who fails to pay wages required by the FLSA or the MWHL is liable to the employee for liquidated damages in an amount equal to the unpaid wages—*i.e.*, double damages. *See Rogers*, 362 F. Supp. 2d at 638; *see also* 29 U.S.C. § 260; Md. Code Ann., Lab. & Empl. § 3-427(d). The employer bears the "plain and substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Wright v. Carrigg*, 275 F.2d 448, 449 (4th Cir. 1960). Given that Defendants have not filed a responsive pleading, they have not met their burden. Thus, Plaintiff is entitled to at least liquidated damages in an amount equal to Plaintiff's unpaid wages.

#### 2.     Treble Damages under the MWPCL

Plaintiffs also seek treble damages under the MWPCL. ECF No. 1 ¶ 49; ECF No. 13-1 at

8–10. Employees seeking enhanced damages are "entitled to recover liquidated damages under the FLSA or treble damages under [MWPCL], but not both." *Quiroz v. Wilhelm Commercial Builders, Inc.*, No. WGC-10-2016, 2011 WL 5826677, at *3 (D. Md. Nov. 17, 2011). The MWPCL states that if "a court finds that an employer withheld the wage of an employee in violation of" the statue and "not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." Md. Code Ann., Lab. & Empl. § 3-507.2(b). A bona fide dispute is "a legitimate dispute over the validity of the claim or the amount that is owing" such that the employer had a good faith basis for withholding payment. *Admiral Mortg., Inc. v. Cooper*, 745 A.2d 1026, 1031 (Md. 2000). Although the statute is silent on which party bears the burden of proof on this issue, the Maryland Court of Appeals has placed the burden on the employer to prove the bona fide dispute. *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 628 (Md. 2014). Nonetheless, "an employee is not presumptively entitled to enhanced damages, even if the court finds," as it does here, "that wages were withheld without a bona fide dispute." *Id.* at 630. Rather, trial courts are simply "encouraged to consider the remedial purpose of the [M]WPCL when deciding whether to award enhanced damages to employees.'" *Id.* It is customary in this district to award double damages under the FLSA, but not treble damages under the MWPCL, when the defendants fail to offer any evidence of a bona fide dispute, making liquidated damages appropriate, but the plaintiffs fail to offer any evidence that they suffered consequential damages from the underpayments. *Villatoro v. CTS & Assocs., Inc.*, No. DKC-14-1978, 2016 WL 2348003, at *3 (D. Md. May 4, 2016) (citing *Clancy v. Skyline Grill, LLC*, No. ELH-12-1598, 2012 WL 5409733, at *8 (D. Md. Nov. 5, 2012)).

      Here, Defendants have not responded and have thus failed to offer evidence of a bona

fide dispute. Plaintiffs, on the other hand, have offered evidence that they suffered consequential damages because of Defendants' underpayments. Specifically, Plaintiffs assert in their sworn affidavits that they were forced to, among other things, take on additional credit card debt, draw from retirement funds, default on rent payments, default on loan payments, and default on credit card payments. ECF No. 13-2 ¶¶ 18–19; ECF No. 13-3 ¶¶ 15–17; ECF No. 13-4 ¶¶ 18–22; ECF No. 13-5 ¶¶ 16–19. Because Defendants fail to offer evidence of a bona fide dispute, and Plaintiffs have demonstrated through sworn statements that they suffered consequential damages, the Court will award treble damages.

### 3. Damages Calculation

The Court calculates the amount of damages Defendants owe Plaintiffs based on Plaintiffs' rate of compensation and the length of time during which Plaintiffs did not receive pay. *See Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 798 (D. Md. 2010). As to evidence of those elements:

> [A]n employee's statement under oath "as to his recollection of the hours he worked and the pay he received, if considered credible by the trier of fact, is sufficient to establish a prima facie case of wages owed," and if the employer does not successfully rebut the employee's statement, "[t]he Court may award damages based on Plaintiff's testimony even though the amounts claimed are only approximated and not perfectly accurate."

*Calderon Recinos v. JMZ Constr., LLC*, No. DKC-15-0406, 2016 WL 3162820, at *3 (D. Md. June 7, 2016) (internal citation omitted).

#### a. Plaintiff Hill

According to Plaintiff Hill's sworn affidavit: (1) Plaintiff Hill worked for Defendants from approximately May 7, 2018 until June 12, 2019, ECF No. 13-4 ¶¶ 5, 15; (2) Plaintiff Hill's agreed upon salary during that time was $250,000 per year, which is approximately $4,807.69 per week, *id.* ¶ 8; and (3) Defendants failed to pay Plaintiff Hill for work performed between

15

January 18, 2019, and June 12, 2019, *id.* ¶¶ 11–12, 15–16. Based on these sworn statements, the Court finds Defendants failed to compensate Plaintiff Hill for 21.71 pay periods during which she should have received regular pay of $4,807.69 per week, totaling $104,395.60 in unpaid regular wages. Md. Code Ann., Lab. & Empl. § 3-502(a)(1)(ii) (requiring payment of wages). Thus, as discussed above, *see supra* § III.B.2, pursuant to Md. Code Ann., Lab. & Empl. § 3-507.1(b) (allowing for treble damages), Defendants are liable to Plaintiff Hill for $313,186.81.

### b. Plaintiff Fox

Plaintiff Fox states in her sworn affidavit that: (1) she worked for Defendants from approximately May 25, 2018 until March 8, 2019, ECF No. 13-5 ¶¶ 5, 13; (2) her agreed upon salary was $50,000 per year, which amounts to approximately $961.54 weekly, *id.* ¶ 9; and (3) Defendants failed to pay her for work performed between January 18, 2019, and March 8, 2019, *id.* ¶¶ 11, 13–14. Based on these sworn statements, the Court finds Defendants failed to compensate Plaintiff Fox for 8 pay periods during which she should have received regular pay of $961.54 per week, totaling $7,692.31 in unpaid regular wages. Md. Code Ann., Lab. & Empl. § 3-502(a)(1)(ii) (requiring payment of wages). Thus, as discussed above, *see supra* § III.B.2, pursuant to Md. Code Ann., Lab. & Empl. § 3-507.1(b) (allowing for treble damages), Defendants are liable to Plaintiff Fox for $23,076.92.

### c. Plaintiff Nolet

In her affidavit, Plaintiff Nolet states that: (1) she worked for Defendants from approximately August 20, 2018 until March 8, 2019, ECF No. 13-2 ¶¶ 5, 13; (2) her agreed upon salary was $50,000 per year, which amounts to $961.54 weekly, *id.* ¶ 8; and (3) Defendants failed to pay her for work performed between January 18, 2019, and March 8, 2019, *id.* ¶¶ 10, 13–14. The Court finds that, based on Plaintiff Nolet's sworn statements, Defendants failed to

compensate Plaintiff Nolet for 8 pay periods during which she should have received regular pay of $961.54 per week, totaling $7,692.31 in unpaid regular wages. Md. Code Ann., Lab. & Empl. § 3-502(a)(1)(ii) (requiring payment of wages). Thus, as discussed above, *see supra* § III.B.2, pursuant to Md. Code Ann., Lab. & Empl. § 3-507.1(b) (allowing for treble damages), Defendants are liable to Plaintiff Nolet for $23,076.92.

Plaintiff Nolet also states in her sworn affidavit that, at Defendants' request, she took out a loan of $19,000 and paid that amount to Plaintiff Hill for purposes of office rent. ECF No 13-2 ¶ 15. She further states that Defendant Vincent Caccamo promised to pay her back by paying her additional wages each week, but he did not follow through on this promise. *Id.* Consequently, Plaintiff Nolet also requests that the Court consider the $19,000 loan as regular wages in its damages calculations. However, under the MWPCL, wage is defined as "all compensation that is due to an employee *for employment*" and includes bonuses, commissions, fringe benefits, overtime wages, and "any other remuneration promised *for service*." Md. Code Ann., Lab. & Empl. § 3-501 (emphasis added). Repayment of a loan made by an employee to an employer does not fall into this definition. Therefore, the Court does not consider the $19,000 that Defendants failed to repay Plaintiff Nolet as unpaid regular wages, and the $19,000 is not part of Plaintiff Nolet's damages calculation.

### d.     Plaintiff Flowers

Plaintiff Flower's sworn affidavit states that: (1) Plaintiff Flowers worked for Defendants from approximately September 28, 2018 until March 8, 2019, ECF No. 13-3 ¶¶ 6, 12; (2) her agreed upon salary was $45,000 per year, which is equivalent to approximately $865.38 per week, *id.* ¶ 9; and (3) Defendants failed to pay Plaintiff Flowers for work performed between January 18, 2019, and March 8, 2019, *id.* ¶¶ 10, 12–13. Based on the statements in Plaintiff

Flowers' affidavit, the Court finds that Defendants failed to compensate Plaintiff Flowers for 8 pay periods during which she should have received regular pay of $865.38 per week, totaling $6,923.08 in unpaid regular wages. Md. Code Ann., Lab. & Empl. § 3-502(a)(1)(ii) (requiring payment of wages). Thus, as discussed above, *see supra* § III.B.2, pursuant to Md. Code Ann., Lab. & Empl. § 3-507.1(b) (allowing for treble damages), Defendants are liable to Plaintiff Flowers for $21,487.90.

### 4.     Prejudgment Interest

All four Plaintiffs also request prejudgment interest in the amount of six percent per annum. ECF No. 13-6. "Because of the availability of enhanced damages, however, such interest is unnecessary and duplicative." *Mata v. G.O. Contractors Grp., Ltd.*, No. TDC-14-3287, 2015 WL 6674650, at *6 (D. Md. Oct. 29, 2015) (denying the plaintiffs' requests for prejudgment interest where the court awarded plaintiffs treble damages under MWPCL); *cf. Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 715 (1945) ("To allow an employee to recover the basic statutory wage and liquidated damages, with interest, would have the effect of giving an employee double compensation for damages arising from delay in the payment of the basic minimum wages."); *Masters v. Md. Mgmt. Co.*, 493 F.2d 1329, 1334 (4th Cir. 1974) (affirming the district court's refusal to award prejudgment interest because "[t]he award of liquidated damages more than adequately compensated [the plaintiff] for the delay in payment of . . . wages due"). The Court, therefore, denies Plaintiffs' claims for prejudgment interest.

### 5.     Attorney's Fees and Costs

Plaintiffs also request an award of reasonable attorney's fees and costs. ECF No. 1 at 8. Such relief is proper the FLSA, 29 U.S.C. § 216(b), the MWHL, Md. Code Ann., Lab. & Empl. § 3-427(a)(3), and the MWPCL, Md. Code Ann., Lab. & Empl. § 3-507.2(b). However, "[s]ince

reasonableness is the touchstone for the award of fees, the party seeking the award bears the burden of proof and "must provide 'detailed records' that specify 'the services performed, by whom they were performed, the time expended thereon, and the hourly rate charged.'" *Osorio de Zavala v. Tortilleria El Volcan, LLC*, No. TDC-17-3093, 2019 WL 2366363, at *8 (D. Md. June 4, 2019) (quoting *Bel Air Plaza Ltd. P'ship v. Ross Dress for Less, Inc.*, No. CCB-14-2533 (2016 3440191, at *1 (D. Md. June 23, 2016)); *see also Monge*, 751 F. Supp. 2d at 800 ("The plaintiff 'must show that the number of hours for which he seeks reimbursement is reasonable and does not include hours that are excessive, redundant, or otherwise unnecessary.'" (citations omitted)); *see, e.g.*, *Diaz v. Mi Mariachi Latin Restaturant Inc.*, No. GJH-18-636, 2-19 WL 528185, at *4 (D. Md. Feb. 11, 2019) (noting plaintiff submitted a detailed declaration by his attorney, an "invoice specifying the hourly billing," and a copy of the retainer agreement in support of his request for attorney's fees and finding the "well documented attorney's fees" to be reasonable). In the instant case, Plaintiffs have not specified the amount of attorney's fees and costs requested nor have they submitted any affidavits, declarations, or other evidence to support their request. Instead, Plaintiffs state in the Motion for Default Judgment that they intend to file a separate Motion for Attorney's Fee and a Bill of Cost pursuant to Fed. R. Civ. P. 54. However, a separate motion is not necessary. Rather, within 14 days, Plaintiffs shall submit a declaration or affidavit (1) specifying the amount of attorney's fees and costs requested; (2) supporting the reasonableness of such an amount; and (3) attaching any additional evidence supporting their request.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Default Judgment, ECF No. 13, is granted, in part, and denied, in part. Default judgment is entered against Defendants in the total

amount of $380,109.89 plus costs and attorney's fees. Specifically, Plaintiff Hill is awarded $313,186.81, Plaintiff Fox is awarded $23,076.92, Plaintiff Nolet is awarded $23,076.92, and Plaintiff Flowers is awarded $20,769.23.

A separate Order shall issue.

Date: <u>September 30, 2021</u>                   ___/s/_____
                                                    GEORGE J. HAZEL
                                                    United States District Judge